**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

---

**CHARLES W. PRITCHARD,**

                              **Plaintiff,**

vs.                                                     1:13-CV-945
                                                                         (DNH/CFH)

**CAROLYN W. COLVIN,**
**Commissioner of Social Security,**

                              **Defendant.**

---

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| Office of Peter M. Margolius<br>7 Howard Street<br>Catskill, New York 12414<br>*Attorney for Plaintiff* | Peter M. Margolius, Esq. |
| Social Security Administration<br>Office of General Counsel<br>26 Federal Plaza, Rm. 3904<br>New York, NY 10278<br>*Attorney for Defendant* | Emily M. Fishman, Esq. |

**Christian F. Hummel, U.S. Magistrate Judge:**

### REPORT-RECOMMENDATION AND ORDER[1]

### INTRODUCTION

      Plaintiff Charles Pritchard, brings the above-captioned action pursuant to 42 U.S.C. § 405(g) seeking a review of the decision from the Commissioner of Social Security ("Commissioner") that denied his application for supplemental social security income ("SSI") and child's insurance benefits ("CIB").

---

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

## PROCEDURAL BACKGROUND

On July 21, 2010, plaintiff filed an application for SSI. (T.19)[2]. On August 16, 2010, plaintiff filed an application for CIB. (T. 19). Plaintiff was 18 years old at the time of the applications with no prior work experience. (T. 191). Plaintiff claimed that he became unable to work beginning on January 24, 2010 due to mood disorder, PTSD, depression, anxiety disorder and back pain. (T. 190). On November 24, 2010, plaintiff's applications were denied and plaintiff requested a hearing by an Administrative Law Judge ("ALJ"), which was held on November 1, 2011. (T. 19). Plaintiff appeared with a non-attorney representative. On December 9, 2011, the ALJ issued a decision denying plaintiff's claim for benefits. (T. 19-34). The Appeals Council denied plaintiff's review on June 11, 2013, making the ALJ's decision the final determination of the Commissioner. (T. 1-4). This action followed.

## DISCUSSION

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities." The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof

---

[2]"(T.)" refers to pages of the Administrative Transcript, Dkt. No. 8.

2

> on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal citations omitted). In addition to showing a disability under the five-step sequential analysis, a claimant seeking CIB must also be the child of an insured person who is entitled to old-age or disability benefits or who has died, be dependent on the insured, be unmarried, and demonstrate that his disability began before age twenty-two. *Gillard v. Colvin,* 2013 WL 954909, at *1 (N.D.N.Y. 2013) (citing 20 C.F.R. § 404.350(a)).

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw*, 221 F.3d at 131. Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

The ALJ found at step one that plaintiff had not attained age 22 as of January 24, 2010 and has not engaged in substantial gainful activity since that time. (T. 21). At step two, the ALJ concluded that plaintiff suffers from the following severe impairments: obesity, asthma, the residual effects of knee injuries, a back injury, mood disorder, depression, anxiety, posttraumatic stress disorder and a learning disability. (T. 21). At step three, the ALJ determined that plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in the Listing of Impairments. The ALJ then found that plaintiff had the Residual Functional Capacity ("RFC") to "perform the full range of medium work as defined in 20 CFR 404.1567(c) and 416.967(c), except that claimant is limited in his ability to kneel and

squat with environmental limitations for breathing, and claimant has the residual functional capacity to perform unskilled work as defined in 20 CFR 404.1568(a) and 416.968(a) in a low stress environment with occasional interaction with others". (T. 28). At step four, the ALJ concluded that plaintiff had no past relevant work. (T. 33). At step five, relying on the Medical-Vocational Guidelines ("the grids") set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 2, the ALJ found that plaintiff had the RFC to perform jobs existing in significant numbers in the national economy. (T. 33). Therefore, the ALJ concluded that plaintiff was not under a disability as defined by the Social Security Act. (T.34).

In seeking federal judicial review of the Commissioner's decision, plaintiff alleges that: (1) the ALJ's RFC assessment is not supported by substantial evidence; (2) the ALJ erroneously concluded that plaintiff had "at least a high school education"; and (3) the ALJ erred when he failed to secure testimony from a vocational expert. (Dkt. No. 10).

## I.  RFC

Residual functional capacity is:

> "what an individual can still do despite his or her limitations.... Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96 8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96 8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996)). In making the RFC determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis. 20 C.F.R.

4

§ 404.1545(a). The ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and plaintiff's subjective evidence of symptoms. 20 C.F.R. §§ 404.1545(b)-(e).

Plaintiff argues that the RFC is not supported by substantial evidence because the ALJ failed to include limitations for bending and stooping and because the ALJ failed to consider the results of plaintiff's IQ testing.

A.  **Postural Limitations**

At Step Two of the analysis, the ALJ concluded:

> . . . the medical evidence of record demonstrates that claimant's obesity and the residual effects of his knee injuries limit his ability to engage in exertional activities such as squatting, bending, stooping and kneeling." (T. 22).

In reaching this conclusion, the ALJ relied upon and cited to the Internal Medicine Evaluation conducted by Kautilya Puri, M.D. (T. 408). On September 20, 2010, Dr. Puri evaluated plaintiff at the request of the agency. Plaintiff complained of asthma, depression, anxiety and PTSD. Upon examination, Dr. Puri noted that plaintiff was "in no acute distress", his gait was normal, he walked without difficulty, and his squat was mildly decreased. Plaintiff was able to rise from a chair and the exam table without assistance or difficulty. Plaintiff's musculoskeletal examination was normal with full range of motion in his spine and all extremities without any tenderness, swelling or effusion. Dr. Puri opined that plaintiff had "mild limitations to squatting, bending, stooping, kneeling". (T. 410). He further concluded, "[t]here were no objective limitations to the claimant's gait or to his activities of daily living". (T. 410).

As noted *supra*, the ALJ found that plaintiff has the RFC to:

> "perform the full range of medium work as defined in 20 CFR 404.1567(c) and 416.967(c), except that claimant is limited in his

5

ability to kneel and squat with environmental limitations for breathing, and claimant has the residual functional capacity to perform unskilled work as defined in 20 CFR 404.1568(a) and 416.968(a) in a low stress environment with occasional interaction with others". (T. 28).

"Medium Work," as defined by the Social Security Administration, "involves lifting no more than fifty pounds at a time with frequent lifting or carrying of objects weighing up to twenty-five pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c) (2011); 20 C.F.R § 416.967(c) (2011). Medium work requires the ability to stoop and bend frequently. *Zwick v. Apfel*, 1998 WL 426800, at *8 (S.D.N.Y. 1998); *Avila*, 933 F.Supp.2d at 648.

Plaintiff argues that the ALJ contradicted himself when he failed to acknowledge plaintiff's limitations for bending and stooping in the RFC analysis. The Commissioner disagrees noting that none of plaintiff's treating physicians offered an opinion with respect to plaintiff's ability to frequently bend and stoop.

The ALJ discussed plaintiff's alleged postural limitations during the RFC analysis and noted:

> The opinion evidence supports a finding that claimant retains the residual functional capacity to perform the full range of medium work, except that claimant is limited in his ability to kneel and squat. Dr. Rabadi assessed that claimant was not limited in his ability to lift and carry, stand or walk, sit and push and pull. In addition, Dr. Rabadi found there were no limitations on claimant's postural manipulative and visual abilities. (T. 31).

Ibrahim Rabadi, M.D. was plaintiff's treating physician and, on February 22, 2011, Dr. Rabadi completed an MSS for the agency. Dr. Rabadi noted that the frequency of his treatment was "PRN"[3] and that plaintiff was first treated at his office on December 18, 2007. Plaintiff's

---

[3] PRN is an abbreviation for "as needed". http:// www. medilexicon. com (last visited June 20, 2014).

most recent visit was January 21, 2010. Dr. Rabadi diagnosed plaintiff with obesity, asthma, internal derangement of left knee, bipolar disorder and depression. Under "clinical findings", Dr. Rabadi noted, "not enthusiastic about school and sports and is lazy." Dr. Rabadi attributed plaintiff's depression to his obesity and laziness. (T. 240). With respect to plaintiff's ability to perform work-related functions, the doctor opined that plaintiff had no limitation on his ability to lift and carry; stand and/or walk; sit; and push and/or pull. Plaintiff had no restrictions for postural, manipulation, visual, communicative or environmental impairments. However, the doctor would not provide an opinion on plaintiff's functional abilities. (T. 238 - 242)

On September 13, 2010, Dr. Rabadi completed a second MSS. (T. 393-402). The assessment was based on an examination completed on September 3, 2010. At that time, Dr. Rabadi diagnosed plaintiff with bipolar disorder, depression, obesity, asthma and migraine headaches. Internal knee derangement is not listed as a diagnosis. The doctor noted that "patient is lonesome and depressed and lazy, doesn't want to work or exercise and does not like school". Dr. Rabadi treated plaintiff with prescriptions for Zoloft and Geodon.[4] The doctor opined that plaintiff is "able to work if he wants to". (T. 398). The doctor's opinion with respect to plaintiff's ability to perform work-related functions was unchanged.

Taking into consideration Dr. Puri's evaluation and Dr. Rabadi's opinion, the Court finds that substantial support exists for the ALJ's RFC analysis. Dr. Puri concluded that plaintiff's postural limitations were "mild" and Dr. Rabadi specifically opined that plaintiff did not have any postural limitations. Moreover, the record contains additional support for the ALJ's conclusions. On November 16, 2010, Dr. Todd Shatynski, a physician affiliated with Capitol Region

---

[4] Zoloft is an antidepressant. *Dorland's Illustrated Medical Dictionary*, 1854 (31st Ed.2007). Geodon is a "prescription medicine called a psychotropic . . . and can be used to treat symptoms of schizophrenia and acute manic or mixed episodes associated with bipolar disorder." *Physicians' Desk Reference*, 2730 (64th ed.2010).

Orthopaedics, performed an orthopedic consult for Dr. Rabadi. (T. 448). Plaintiff complained of acute back pain after pushing carts at his job at Wal-mart. Dr. Shatynski diagnosed plaintiff with an acute lumbar strain and advised plaintiff to remain out of work until November 23, 2010. He prescribed Flexeril and physical therapy. On December 3, 2010, plaintiff returned for a follow-up and was noted "90% improved" but claimed that he could not push carts at work. X-rays were taken and showed no evidence of any instability or degenerative disc disease. The diagnosis was lumbar deconditioning with recurrent strain. Plaintiff was advised to return to work on December 24, 2010 on light duty. On January 4, 2011, plaintiff returned feeling "100% improved" but "cautious". Plaintiff had not yet returned to work because there was no available "light duty" position. Plaintiff claimed he was working with his job coach and trying to get to the gym to lose weight. After examining plaintiff. the doctor "explained how this can be managed with continued fitness and core stability programs". The doctor recommended progressing slowly back to work and physical labor type activities.

Based upon the opinion evidence, the ALJ's determinations are not contradictory. While the ALJ found that the medical evidence revealed "limitations" to bending and stooping, there is no evidence that these limitations prevented plaintiff from performing work-related functions. Plaintiff has failed to cite to any portion of the record that supports his conclusory assertion that his limitations in bending and stooping prevent him from performing medium work. Indeed, the medical evidence belies his claims. The objective medical evidence revealed no abnormalities and all physical examinations were normal. Plaintiff's own treating physicians concluded that plaintiff did not suffer from any restrictions in performing work-related activity, described plaintiff as "lazy" and urged plaintiff to attempt to return to work. The consultative physician opined that plaintiff suffered only mild limitations in bending and stooping. The record lacks any

8

evidence from any physician that these postural limitations rendered plaintiff unable to work. The Court finds no basis for remand on this issue.

**B.     IQ Testing**

Plaintiff argues that the ALJ failed to acknowledge his performance IQ of 66. Plaintiff asserts that this result supports a finding that his "slow speed in performing tasks precludes work that requires a production quota". Thus, plaintiff argues that the RFC analysis is flawed. Plaintiff relies upon the March 19, 2008 report from Catskill Central School District Psychologist, Bettina Young. The Commissioner disagrees and contends that plaintiff cites to one countervailing finding that he has "taken this finding grossly out of context" and conversely, substantial evidence supports the ALJ's decision to reject this finding.

"[T]he regulations recognize that individuals with IQ scores in the 60s or even lower may still be able to work full-time if their adaptive functioning is still intact." *Clark v. Colvin*, 2013 WL 6795627, at *12 (N.D.N.Y. 2013) (citing *Talavera v. Astrue*, 697 F.3d 153 (2d Cir. 2012)). In *Lawler v. Astrue*, 512 F. App'x 108 (2d Cir. 2013), the plaintiff argued that the ALJ erred when he failed to consider plaintiff's IQ in the RFC analysis. The Second Circuit held:

> The ALJ's opinion, however, shows that it did consider Lawler's mental abilities when it calculated his RFC. The ALJ noted several different medical opinions about Lawler's ability to remember and follow instructions, perform simple tasks, and engage in unskilled work.

*Id*. at 111.

On March 19, 2008, Bettina Young, the Catskill Central School District School Psychologist, was asked to perform a psychoeducational evaluation of plaintiff. Dr. Young took a history from plaintiff's mother and noted that plaintiff was diagnosed with bipolar disorder, anxiety and PTSD and was taking Zoloft for depression and "Geddon [sic] for anxiety". As part

9

of the evaluation, Dr. Young administered IQ testing. The ALJ addressed Dr. Young's report at Step Two of the sequential analysis noting that plaintiff:

> was assigned a Full scale IQ of 83, a verbal Comprehension IQ of 103, and a performance IQ of 66 from [Dr. Young]. (T. 25).
>
> While claimant's obesity does qualify as a physical impairment imposing additional and significant work-related limitation on function because it is severe, there are numerous reasons to reject the validity of the performance IQ score of 66 as indicative of claimant's intelligence. Most significantly, the evaluator who conducted that testing doubted its accuracy and assessed that claimant likely functions within the low average to average range of intelligence. The evaluator noted that performance IQ score of 66 was inconsistent with claimant's prior testing. That previous intellectual testing found that claimant functioned overall within the average range of intelligence, with a KBIT composite standard score of 96; Vocabulary standard score of 106; and Matrices standard score of 87. The evaluator believed that claimant's WASI performance score was greatly affected by his slow approach to the Block Design subtest, lowering his general cognitive score. Claimant was unable to complete several Block Designs because he ran out of time. When tested beyond those time limits, claimant was able to complete the designs correctly. The evaluator concluded that claimant most likely functions within the low average to average range of intelligence. (T. 26).

The ALJ concluded, "Based on the totality of evidence, I find that the performance IQ of 77 is not valid or indicative of claimant's intelligence". (T. 26).

Upon review of the record, the Court finds that the ALJ considered all relevant evidence of record and adequately explained his reasoning for rejecting plaintiff's performance IQ score of 66. The ALJ thoroughly analyzed and discussed Dr. Young's report and acknowledged Dr. Young's own lack of confidence in the results. In addition, the ALJ discussed the October 2010 psychiatric evaluation conducted by Kerry Brand, Ph.D, at the request of the agency. (T. 405). Dr. Brand noted that plaintiff's speech was fluent and his language skills were adequate. Plaintiff's memory skills were mildly impaired and his intellectual functioning was estimated in the "below average

10

range". Dr. Brand noted that plaintiff could dress, bathe and groom himself, he does general cleaning, he gets along with friends and his hobbies are movies and TV. Dr. Brand opined that plaintiff could follow and understand simple directions and perform simple tasks with supervision. Dr. Brand further concluded that plaintiff would have moderate difficulty maintaining attention/concentration and a regular schedule as well as moderate difficulty learning new tasks or performing complex tasks independently.

Plaintiff has not cited to any evidence in the record to support his assertion that his IQ score of 66 renders him mentally deficient. However, even assuming that the ALJ erred when he disregarded the IQ scores, plaintiff's conclusory assertion that the score precludes him from performing work that requires a production quota is unsupported and meritless. Plaintiff does not cite to one report, opinion or fact in the record to support that assertion. Accordingly, remand is not warranted on this issue.

## II. Step Five of the Sequential Analysis

Under the Social Security Act, the Commissioner bears the burden of proof for the final determination of disability. *Pratt v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996). Generally speaking, if a claimant suffers only from exertional impairments, then the Commissioner may satisfy his burden by resorting to the applicable rule of the Medical Vocational Guidelines set forth at 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly called "the Grids" or the "Grid").[5] *Pratt,* 94 F.3d at 39. The function of the Grids was succinctly summarized by the court in *Zorilla v. Chater*, 915 F.Supp. 662, 667 (S.D.N.Y.1996) as follows:

---

[5] An "exertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (i.e. sitting, standing, walking, lifting, carrying, pushing, and pulling). 20 C.F.R. §§ 404.1569a(b), 416.969a(b); *see also Rodriguez v. Apfel*, 1998 WL 150981, at *10, n. 12 (S.D.N.Y.1998).

11

>In meeting [his] burden of proof on the fifth step of the sequential evaluation process described above, the Commissioner, under appropriate circumstances, may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid." The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the Grid is dispositive on the issue of disability.

Ordinarily, the ALJ need not consult a vocational expert, and may satisfy this burden "by resorting to the applicable medical vocational guidelines (the grids)". *Id*. at 78 (citing 20 C.F.R. Pt. 404, Subpt. P, App.2).

## A.   Education Level

At Step Five of the analysis, the ALJ concluded that plaintiff, "has at least a high school education and is able to communicate in English". (T. 33). Plaintiff claims, with citations to the record, that this finding constitutes reversible error because his education was actually "limited" as a result of receiving an IEP diploma. The Commissioner cites to the transcript from the administrative hearing wherein plaintiff asserts that he completed high school.

Education is a vocational factor. 20 CFR §§ 404.1564; 416.964. provide, in relevant portion:

>a) General. Education is primarily used to mean formal schooling or other training which contributes to your ability to meet vocational requirements, for example, reasoning ability, communication skills, and arithmetical ability. However, if you do not have formal schooling, this does not necessarily mean that you are uneducated or lack these abilities. Past work experience and the kinds of responsibilities you had when you were working may show that you have intellectual abilities, although you may have little formal education. Your daily activities, hobbies, or the results of testing may also show that you have significant intellectual ability that can be used to work.

12

> (b) How we evaluate your education. The importance of your educational background may depend upon how much time has passed between the completion of your formal education and the beginning of your physical or mental impairment(s) and by what you have done with your education in a work or other setting. Formal education that you completed many years before your impairment began, or unused skills and knowledge that were a part of your formal education, may no longer be useful or meaningful in terms of your ability to work. Therefore, the numerical grade level that you completed in school may not represent your actual educational abilities. These may be higher or lower. However, if there is no other evidence to contradict it, we will use your numerical grade level to determine your educational abilities. The term education also includes how well you are able to communicate in English since this ability is often acquired or improved by education. In evaluating your educational level, we use the following categories:
>
> (3) Limited education. Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.
>
> (4) High school education and above. High school education and above means abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above. We generally consider that someone with these educational abilities can do semi-skilled through skilled work.
>
> (6) Information about your education. We will ask you how long you attended school and whether you are able to speak, understand, read and write in English and do at least simple calculations in arithmetic. We will also consider other information about how much formal or informal education you may have had through your previous work, community projects, hobbies, and any other activities which might help you to work.

*See* 20 CFR §§ 404.1564; 416.964.

During the Administrative Hearing, plaintiff was asked about his education:

> Q: Okay. Are you in school now?
> A: I graduated.
> Q: When did you graduate?

> A: 2010.
> Q: So you completed high school?
> A: Yes.
> Q: Was it regular or special?
> A: I was in the IEP Program. (T. 44).

Here, the ALJ relied upon Section 203.28 of the medical vocational guidelines, which considers a claimant, a younger individual, with a high school education or more with prior work experience that is unskilled and found that plaintiff was not disabled.[6] *See* 20 C.F.R. pt. 404, subpt. P, app. 2, rule 203.28. The briefs for the parties herein lack any citation to any relevant caselaw supporting the respective positions. On it's own accord, the Court has found cases, in other Districts, where the ALJ misconstrued the record and relied upon an inapplicable Grid. In *Burrell v. Astrue*, 2012 WL 3817788, at *4, n.6 (S.D.Ala. 2012), the Court determined that such an error was harmless:

> Despite plaintiff's prior work being unskilled, the ALJ utilized Grid Rule 203.93, which refers to someone whose past relevant work was skilled or semi-skilled but the skills are not transferable [. . . ]. The court is satisfied that, where there exists another Grid Rule applicable to plaintiff's position which would support the same determination as was made using the wrong rule, harmless error analysis applies. *Caldwell v. Barnhart*, 261 F. App'x 188, 190 (10th Cir. 2008)( citing *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) ("When, however, an incorrect application of the regulations results in harmless error because the correct application would not contradict the ALJ's ultimate findings, the ALJ's decision will stand."). Because application of 20 C.F.R. Part 404, subpt. P, app. 2, § 203.28, applies to a younger individual with at least a high school education, who is limited to medium work, and whose past relevant work was unskilled, and would similarly support a finding that such a person was not disabled, the court finds the error to be harmless.

---

[6] Unskilled work is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength." 20 C.F.R. § 404.1568(a).

Moreover, Courts have held that the ALJ may rely upon an applicant's own statements in determining that a plaintiff had a high school education. In *Arce v. Barnhart*, 185 F. App'x 437, 440 (5th Cir. 2006), the plaintiff argued that the ALJ should not have applied Rule 203.28 of the Guidelines because she did not have a high school education. The plaintiff claimed that the ALJ should not have relied on school reports and her own testimony to conclude that she had a high school education. The Court rejected the plaintiff's argument holding:

> We recently addressed whether an ALJ can rely on an applicant's own statements about his or her education level when there is significant evidence in the record that the applicant does not have skills commensurate with that education level. In *Perez v. Barnhart*, 415 F.3d 457 (5th Cir.2005), the applicant was enrolled in special education classes between sixth and tenth grades and took only non-academic courses during the eleventh and twelfth grades. *Id*. at 462. The applicant claimed that he had difficulty spelling and could not even fill out a job application. *Id.* We held that substantial evidence, specifically the applicant's testimony and school records, supported the ALJ's conclusion that the applicant had a high school education. *Id*. at 463. Because of the factual similarities between this case and Perez, we must hold that substantial evidence supports the ALJ's conclusion that Arce has a high school education.

*Arce*, 185 F. App'x at 440.

In this instance, the ALJ cited to Grid Rule 203.28. Even assuming that plaintiff's argument is correct, there is another Grid Rule, i.e., 203.25, that supports the ALJ's determination. That Grid involves a younger individual with a limited education or less with previous unskilled work experience. *See* 20 C.F.R. pt. 404, subpt. P, app. 2, rule 203.25. The correct application of this Grid does not contradict the ALJ's conclusions. Based upon the relevant caselaw, the Court finds the ALJ's erroneous application of the Regulations resulted in an harmless and does not afford a sufficient basis to warrant remand.

**B.     Vocational Expert**

The Second Circuit has held that "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert or preclude reliance" on the grids.[7] *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir.1986). The testimony of a vocational expert that jobs exist in the economy which claimant can obtain and perform is required only when "a claimant's nonexertional impairments significantly diminish his ability to work-over and above any incapacity caused solely from exertional limitations-so that he is unable to perform the full range of employment indicated by the medical vocational guidelines." *Id*. The use of the phrase "significantly diminish" means the "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity". *Id*. at 606. Under these circumstances, to satisfy his burden at step five, the Commissioner must "introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." *Rosa*, 168 F.3d at 78 (quoting *Bapp*, 802 F.2d at 604). Therefore, when considering nonexertional impairments, the ALJ must first consider the question-whether the range of work the plaintiff could perform was so significantly diminished as to require the introduction of vocational testimony. *Samuels v. Barnhart*, 2003 WL 21108321, at *12 (S.D.N.Y.2003) (holding that the regulations require an ALJ to consider the combined effect of a plaintiff's mental and physical limitations on his work capacity before using the grids).

---

[7] A "nonexertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c). Examples of nonexertional limitations are nervousness, inability to concentrate, difficulties with sight or vision, and an inability to tolerate dust or fumes. 20 C.F.R. §§ 404.1569a(a), (c)(i), (ii), (iv), (v), 416.969a(a), (c)(i), (ii), (iv), (v); *see also Rodriguez* , 1998 WL 150981, at * 10, n. 12.

The ALJ should elicit testimony from the expert by posing hypothetical questions. If a hypothetical question does not include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability. *Melligan v. Chater*, 1996 WL 1015417, at *8 (W.D.N.Y.1996). The "[p]roper use of vocational testimony presupposes both an accurate assessment of the claimant's physical and vocational capabilities, and a consistent use of that profile by the vocational expert in determining which jobs the claimant may still perform." *Lugo v. Chater*, 932 F.Supp. 497, 503 (S.D.N.Y.1996). Further, there must be "substantial evidence to support the assumption upon which the vocational expert based his opinion." *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir.1983).

In this case, the ALJ concluded that based upon plaintiff's RFC for the full range of medium work, a finding of "not disabled" was directed by Rule 203.28 without the need for vocational testimony. (T. 33). There is no evidence that plaintiff's non-exertional impairments resulted in limitations on plaintiff's ability to do medium work. Plaintiff relies upon the arguments presented above (regarding additional physical limitations erroneously excluded from the RFC and non-exertional limitations that excludes work requiring a production quota) and asserts that the ALJ erred in failing to obtain testimony from a vocational expert. Plaintiff does not cite to any portion of the record or any treatment note that indicates that plaintiff's non-exertional impairments significantly impacted her ability to perform work-related functions. As stated above, the RFC analysis is supported by substantial evidence and for the reasons discussed *supra*, plaintiff's arguments lack merit. Therefore, the ALJ was permitted to rely on the Grids at the fifth step of the sequential evaluation to assess that there were a significant number of jobs in the light work category in both the national and local economy that plaintiff could perform.

*See* SSR 83 10; SSR 85 15; *see also Bapp*, 802 F.2d at 605 Accordingly, the Court finds that the ALJ was not obligated to obtain testimony from a vocational expert and properly relied upon the Grids in determining that plaintiff is not disabled.

## CONCLUSION

For the reasons stated above, it is hereby **RECOMMENDED** that the Commissioner's decision denying disability benefits be **AFFIRMED** and plaintiff's motion for judgment on the pleadings (Dkt. No. 10) be **DENIED**.

Pursuant to 28 U.S.C. §636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993); *Small v.Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C §636(b)(1); FED R. CIV. P. 72, 6(a), 6(e).

It is further **ORDERED** that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated: June 24, 2014
      Albany, New York

Christian F. Hummel
U.S. Magistrate Judge